✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

12:39 pm, Aug 30 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____________ Deputy

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

*Paul A. Riley*
*Assistant United States Attorney*
*Paul.Riley@usdoj.gov*

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*DIRECT: 410-209-4959*
*MAIN: 410-209-4800*

August 27, 2024

**VIA ELECTRONIC MAIL**

Gerald C. Ruter, Esq.
Law Offices of Gerald C. Ruter, P.C.
9411 Philadelphia Road, Suite O
Baltimore, Maryland 21237
ruterlaw@verizon.net

Re: *United States v. Joseph Gillespie*, Crim. No: RDB-23-321

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Joseph Gillespie (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by August 30, 2024, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense (Wire Fraud Conspiracy)

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the dates alleged in the Indictment, in the District of Maryland,

a. Two or more persons agreed to try to accomplish a common and unlawful plan to commit the crime of Wire Fraud, as charged in the Indictment; and

b. the Defendant knew the unlawful purpose of the plan and willfully joined it.

Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 20 years | 3 years | $250,000 or twice the gain or loss from the offense | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the

Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

Count One (Count of Conviction)

a. This Office and the Defendant further agree that the applicable base offense, taking into account certain relevant conduct under United States Sentencing Guidelines ("U.S.S.G.") § 1B1.3 is **7 (seven)** pursuant to U.S.S.G. §§ 2B1.1(a)(1), and 2X1.1.

b. This Office and the Defendant further agree that there is a **10 (ten)** level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(F), because the loss amount was more than $150,000 but less than $250,000 (subtotal: **17**).

Relevant Conduct (Bribery Scheme)

c. This Office and the Defendant further agree that the Stipulation of Facts specifically establishes the commission of a bribery offense (the "bribery offense") pursuant to U.S.S.G. § 1B1.2(c).

d. This Office and the Defendant further agree that the base offense for the bribery offense, pursuant to U.S.S.G. § 2C1.1(a), is **14 (fourteen)** because Defendant was a public official.

e. This Office and the Defendant further agree, pursuant to U.S.S.G. § 2C1.1(b)(1), that there is a **2 (two)** level increase because the offense involved more than one bribe.

f. This Office and the Defendant further agree, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(H), that there is a **14 (fourteen)** level increase because the loss to the Government from the offense was more than $550,000 but was less than $1,500,000 (subtotal: **30**).

Grouping And Combined Offense Level

g. Pursuant to U.S.S.G. § 3D1.4, the group for the offense of conviction is to be disregarded because it is **9** or more levels less serious than the Group for relevant conduct. Thus, there is no increase to the offense level of the Group with the highest offense level (32), and the combined offense level is **30**.

h. This Office does not oppose a **2 (two)** level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1 (one)** level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

i. Thus, the final anticipated adjusted offense level is **27**.

j. This Office will not oppose a two-level downward adjustment if the Court determines that the Defendant meets the criteria listed in U.S.S.G. § 4C1.1.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background,

character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

Rule 11 (c) (1) (C) Plea

10. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of between **24 months (2 years) and 60 months (5 years) of imprisonment** in the custody of the Bureau of Prisons is the appropriated disposition of this case taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of at least **$392,104**.

14. If specific direct or substitute assets are forfeited and liquidated, any net proceeds of the asset shall be applied to the money judgment. The Defendant acknowledges that, due to his acts or omissions, the total proceeds he obtained as a result of the scheme to defraud are not available to the government for forfeiture, and the government is entitled to the forfeiture of substitute assets because at least one of the conditions in 21 U.S.C. § 853(p) has been met.

15. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

16. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

17. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Collection of Financial Obligations

18. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. If restitution is not paid by the date of sentencing, in order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant

exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. If restitution is not paid by the date of sentencing, the Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that any financial statement and disclosures the Defendant submits will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C.§ 1001 by an additional five years' incarceration and fine.

Defendant's Conduct Prior to Sentencing and Breach

19. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

20. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

Restitution

21. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation, which the parties stipulate is at least **$1,393,104** (reflecting $143,104 to the United States Small Business Administration and $1,250,000 to the City of Baltimore)

22. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer,

and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Court Not a Party

23.    The Court is not a party to this Agreement. Subject to paragraph 10 above, the sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

24.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

[INTENTIONALLY LEFT BLANK]

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Paul A. Riley
Evelyn L. Cusson
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8·28·24
Date

Joseph Gillespie
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8·28·24
Date

Gerald C. Ruter, Esq.
Counsel to Defendant

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Defendant Joseph Gillespie, born in 1989, is a resident of Baltimore City, Maryland and, at all relevant times, was an employee of the Baltimore City Department of Finance, Revenue Collections Department.

Beginning in July 2020 and continuing through August 2021 in the District of Maryland, Defendant and co-conspirator Ahmed ("Adam") Sary engaged in a scheme to defraud a financial institution, Cross River Bank, and the United States Small Business Administration ("SBA"), to obtain fraudulent loans for various purported businesses under the Paycheck Protection Program ("PPP"), which was part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the Economic Injury Disaster Loan ("EIDL") program.

For the purpose of executing and attempting to execute this scheme to defraud, Defendant and Sary knowingly and willfully transmitted and caused to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1349.

Ultimately, Defendant fraudulently obtained $143,104 in fraudulent PPP and EIDL funds as part of the scheme, and he attempted to obtain $28,366 in EIDL funds too. However, that EIDL loan ultimately did not close.

Moreover, in addition to the CARES Act fraud scheme, Defendant also engaged in a bribery scheme for over eight years whereby, in exchange for bribes from various property owners in Baltimore City (the "City"), Defendant would use his official position as an employee of the City to extinguish various financial obligations owed to the City, including for water bills and property taxes. Typically, Defendant was paid a bribe of ten to fifteen percent of the amount of the financial obligation owed to the City. Defendant received more than $250,000 in connection with the scheme and caused losses to the City in excess of $1,250,000.

Defendant's criminal acts are described in further detail below.

### CARES Act Fraud Scheme

#### *EIDL Advance ($5,000) and PPP Loan ($138,104) – JAG Investments*

On or about July 9, 2020, Defendant made and caused to be made materially false and fraudulent pretenses, representations, and promises to the SBA in connection with the EIDL application (# 3309910164) for JAG Investments—a real estate company owned by Defendant—including the business's gross revenues and number of employees. For example, the application falsely claimed that JAG Investments had five (5) employees and gross revenue of $20,000 for the twelve months prior to January 31, 2020.

The application was submitted to the SBA electronically and caused the transmissions of interstate wires to and from Maryland.

The EIDL was ultimately declined by the SBA on the grounds of "Prohibited EIDL business activity. Real estate development." However, as a result of the application, on or about July 14, 2020, an EIDL advance of $5,000 was funded and distributed to a Wells Fargo bank account controlled by Defendant.

Defendant on January 16, 2021, also attempted to obtain a fraudulent EIDL for JAG Investments in the amount of $28,366. The loan ultimately did not close.

On March 4, 2021, Sary, with the assistance of Defendant, submitted a fraudulent PPP loan application to Cross River Bank to obtain a PPP loan for JAG Investments.

The PPP loan application contained multiple material misrepresentations, including that JAG Investments in 2019 had 19 employees and an average monthly payroll of $55,241.94. In support of the loan application, a fabricated 2019 Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that the entity's "[t]otal payments to all employees" in 2019 was $276,209.72.

The IRS Form 940 was not legitimate, and the information within it was false. In fact, JAG Investments had no employees and did not report paying any wages to or withholding federal income tax from any employees during the 2019 tax year—as confirmed by IRS records.

The PPP loan application also contained a fake and fraudulent February 2020 Wells Fargo bank statement for a Wells Fargo account in the name of JAG Investments and controlled by Defendant. The purported Wells Fargo Bank statement contained several alterations including a false and grossly over-inflated account ending balance, an incorrect transaction date range, and altered state locations associated within the transactional activity. For instance, the date listed on the bank statement, February 29, 2020, does not match the date range listed in the transaction history section of the statement, which runs from "5/11" (May 11, 2020) through "6/8" (June 8, 2020). Also, many of the cities listed in the description section of the transaction history are cities in New Jersey; however, the corresponding state abbreviation following the New Jersey cities is "MD" (Maryland), not "NJ." Further, the document properties associated with the digital PDF file of the purported bank statement indicated it was created in Microsoft Word on March 3, 2021, the day prior to the submission of the PPP loan application. Additionally, the actual Wells Fargo Bank account statement for the JAG Investments account shows a beginning and ending balance of $541.63, whereas the altered statement submitted with the loan application provided shows a beginning balance of $62,968.81 and an ending balance of $61,439.16.

Additionally, Defendant provided Sary copies of various documents to be submitted in connection with the PPP loan application, including photographs of his driver's license and a letter from the IRS assigning an Employer Identification Number for JAG Investments

Based on the false representations and fraudulent submissions made on behalf of Defendant as the owner of JAG Investments on March 6, 2021, the PPP loan was funded, and approximately $138,104 was distributed by Cross River Bank to a First National Bank ("FNB") bank account controlled by Defendant. The distribution of these funds caused the transmission of interstate wires to and from Maryland.

Defendant agreed to pay Sary a kickback payment for his work in submitting the false application and obtaining the fraudulent PPP loan. After the PPP loan funds were received by Defendant, he provided Sary with three checks, each dated March 11, 2021, totaling $38,000—approximately 27% of the PPP loan amount—which were ultimately drawn on JAG Investment's bank account controlled by Defendant.

That same day, March 11, 2021, Defendant searched YouTube using various terms, including "ppp loan audit," "ppp loan how to pay myself," and "what can PPP loan be used for."

The checks provided to Sary were signed by Defendant and in the amounts of $15,000, $13,500, and $10,000. On each of those checks, Defendant left the payee name blank. Thereafter, Sary—to launder the proceeds and attempt to conceal their nature and purpose—wrote a different payee name on each of those checks and deposited them in accounts he controlled.

***Establishment of Payroll for Purported Employees***

According to the parameters of the PPP, proceeds from a PPP loan were required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Defendant and Sary were aware that, under the applicable PPP rules, interest and principal on a legitimate PPP loan were eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

Accordingly, in an attempt to make it appear that the PPP loan funds were being used for legitimate purposes, on March 17, 2021, Defendant, at the suggestion of Sary, signed an agreement with Heartland Payment Systems, Inc. ("Heartland") to provide payroll services to purported employees of JAG Investments. Pursuant to the agreement, and at the direction of Defendant, Heartland withdrew funds from the JAG Investments FNB account referenced above, and made payments using the PPP funds to purported employees of JAG Investments, including Defendant, his brother, and various other friends and associates, including Co-conspirator #1 (discussed in further detail below).

The purpose of establishing payroll services for JAG Investments after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven—which it ultimately was.

In total, $59,499.82 in sham payroll payments were made using funds traceable to the PPP loan obtained by Defendant and JAG Investments. None of the purported employees were in fact legitimately employed by JAG Investments during the time period after the PPP loan was received. Further, several of the purported employees, after receiving the purported payroll payments, provided a portion of the funds directly back to Defendant—usually by means of Cash App or Zelle payments. Moreover, in connection with the scheme, Defendant also engaged in email correspondence with Heartland concerning the purported employees to be added to the payroll.

Defendant did not make any payments to Cross River Bank in connection with the PPP loan obtained for JAG Investments.

***Spending of PPP Funds***

Defendant spent the fraudulently obtained loan proceeds in various ways that were impermissible under the PPP program, including by paying $38,000 in kickbacks to Sary, using the funds to purchase and rehabilitate real estate in Baltimore City, providing PPP funds to various friends, family members and associates for purposes unrelated to employment, making large cash withdrawals for himself, and paying off various personal debts.

**Bribery Scheme**

At all times material to this matter, Defendant was an employee within the Baltimore City Department of Finance, Revenue Collections Department, located within the Abel Wolman Municipal Building. Defendant was hired by the City in or about June 2006.

Beginning in or about early 2016, at the latest, and continuing until the date of his arrest by law enforcement on or about September 20, 2023, Defendant engaged in a bribery scheme in which he abused his position of trust as a public official for his own personal gain.

During this period, Defendant routinely accepted bribes from various property owners in the City whose property was subject to various financial obligations and, if the obligations remained unpaid, tax sale. He accepted these bribes in exchange for removing or extinguishing these financial obligations owed to the City, including for citations, tax obligations, and water obligations—thereby causing losses to the City. Defendant also, at times, accepted bribes in exchange for delaying or postponing—without approval or permission from other City officials—due dates for the payment of outstanding financial obligations, fines, and payments owed to the City, thus forestalling the placement of a lien on the property by the City.

***Acceptance Of Bribes Paid By FBI UC***

Defendant engaged in multiple covertly recorded telephone and video conversations with a Federal Bureau of Investigation undercover agent ("UC") in which Defendant and the UC discussed Defendant receiving bribe payments in exchange for extinguishing certain monies owed to the City of Baltimore and for delaying / postponing due dates in relation to outstanding fines and or payments owed to the City of Baltimore in connection with certain properties.

In a recorded phone conversation with the UC, the UC confirmed the size of the bribe payment with Defendant: "[S]o you want 100 for each property?" Defendant said, "yeah that's basically how I do." Defendant then informed the UC that he (Defendant) had a "girl" in "water"—*i.e.*, the Baltimore City Department of Public Works—that could "wipe some shit out," referring to financial obligations owed to the City.

During a covert video recording of the conversation with the UC, Defendant told the UC that he had the ability to "wipe a bill off" the City's record of outstanding obligations tied to a particular property or to "put paid next to 'em," even though the financial obligation had not in fact been paid. Defendant further stated that he removed certain financial obligations linked to the properties that the UC told Defendant were his, stating "There was a couple, extra miscellaneous bills that y'all had that I wiped off. . . . That shit gone now." Defendant also extended the deadline for payment of financial obligations owed to the City on the eight properties by three months.

Defendant asked for $800 in bribes in return—$100 for each of the eight properties, and, during the recorded meeting, the UC provided Defendant $800 cash. Defendant also stated that he had the ability to wipe out overdue water bills owed to the City, "Once I let you know [about a big water bill], I'll give it to my girl, and I'll tell you what you need to give me for her to knock it off." Defendant then stated:

> Going forward, I'm just your inside man . . . That's what I do for a lot of different people around the City. You know what I mean – manage their shit for them a little bit. . . . I'm gonna go look at your shit. Any one with a high water bill I'm gonna text you the address, and I'm gonna tell you what I need, and we can knock them out going forward with that. . . . Any water bill that's too high, I'll get my girl to take care of that.

Defendant's bribery scheme continued for years thereafter, and he enlisted the help of multiple co-conspirators in connection with his scheme. These co-conspirators (including Co-conspirator #1 and Co-conspirator #2) who, at times, referred various individuals seeking to have Defendant remove or reduce financial obligations owed to the City in exchange for bribes. Moreover, numerous individuals (including Co-conspirator #3) routinely paid bribes to Defendant

in exchange for Defendant extinguishing various bills they owed to the City, including water bills and tax bills.

The size of the bribe paid to Defendant was typically 10% to 15% of the amount owed to the City. For example, if an individual owed the City $10,000 in outstanding tax and water bills, Defendant would typically seek a bribe in the amount of $1,000 to $1,500 in exchange for extinguishing the financial obligations and making the amount due and payable to the City zero dollars. Once Defendant received the bribe payment, he would extinguish the financial obligation owed to the City by marking the obligations as paid in the City's online records. After removing the obligation, Defendant would, at times, send a photograph of a cashier slip from his office reflecting that a payment was made towards a financial obligation owed to the City when, in fact, no such payment was made.

***Acceptance Of Bribes Facilitated By Co-Conspirator #1***

Moreover, for a period of at least 18 months, Co-conspirator #1 referred numerous individuals to Defendant for the purpose of Defendant, in exchange for a bribe from the individuals, removing various financial obligations owed to the City by the individuals. Co-conspirator #1 likewise demanded a bribe for his role in referring individuals to Defendant. Co-conspirator #1 would typically (1) coordinate with a particular individual and obtain the address of each property linked to the individual that owed money (e.g., outstanding taxes, water bills) to the City; and (2) send the address or addresses to Defendant by means of text messages.

Defendant would then (1) determine the total amount of financial obligations owed to the City for each address; (2) set the size of the bribe payment to Defendant that was required for him to extinguish the obligations owed on each address; (3) accept the bribe payment from Co-conspirator #1 who had already gathered it from the individual paying the bribe, which was typically cash; and (4) after receiving the bribe payment by cash or, occasionally, Cash App or Zelle (effecting interstate wires), remove the financial obligations owed to the City, despite the fact that no payment or payments to the City had in fact been made.

For example, in May 2022, Co-conspirator #1 sent by means of a text message to Defendant's personal mobile phone an address associated with an individual who approached co-conspirator #1 about enlisting Defendant's services. Defendant responded, "The water 5200[.] The tax like 2800"—referring to the dollar amounts owed to the City in connection with the property. Defendant then set the price of the bribe required to extinguish the financial obligations: "I will do 1200 for both bro." Co-conspirator #1 then responded, "let me get the br[e]ad"—referring to the bribe payment—"and then it's a go."

Likewise, in September 2023, Co-conspirator #1 again sent by means of a text message to Defendant's business mobile phone various addresses whose owners sought to extinguish the property tax financial obligations owed to the City on each address:

> All tax
> [Address 1]- 9173
> [Address 2]- 8750
> [Address 3]- 14,160
> [Address 4]- 4720
> [Address 5]- 1418

Defendant then wrote back and provided the dollar amount of the bribe required to extinguish the financial obligation for each property—approximately 10% of the dollar amount of each obligation:

900
800
1200
450
200

Co-conspirator #1 responded, "[B]et I'm on it" and, the following day, "Gm bro it's a go I'll see u this evening." Co-Conspirator #1 would go on to collect the funds and provide them to Defendant the following day, noting in a text message, "Put 3200 in the mail slot that for the last list I sent u[.] Owe u $500[.] The money for [Address 6] in there."

***Acceptance Of Bribes Facilitated By Co-Conspirator #2***

Defendant referred to Co-conspirator #2 as "Big Sis." Like Co-conspirator #1, Co-Conspirator #2 referred multiple individuals to Defendant for the purpose of Defendant, in exchange for a bribe from the individuals, removing various financial obligations owed to the City by the individuals. Co-Conspirator #2 would send Defendant various addresses that owed money (e.g., outstanding taxes, water bills) to the City, and Defendant, in turn, would after receiving the bribe payment remove the financial obligations owed to the City, despite the fact that no payment or payments to the City had in fact been made. Defendant would then send Co-Conspirator #2 receipts reflecting that the obligations had been paid when, in fact, they had not been.

Defendant communicated with Co-Conspirator #2 by phone and in person, and bribes were paid by Co-Conspirator #2 via cash and Cash App.

Moreover, apart from his work with Co-conspirator #1 and Co-conspirator #2 in connection with the scheme, Defendant also routinely received bribes from members of the public that owned properties in City, including Co-conspirator #3, in exchange for Defendant eliminating or lowering the financial obligations they owed to the City. Defendant communicated with those individuals in person and over text message.

***Acceptance Of Bribes From Co-Conspirator #3***

For example, in September 2022, Defendant and Co-conspirator #3 discussed over text message various properties owned by Co-conspirator #3 that each had outstanding financial obligations due to the City. In response to an inquiry from Co-conspirator #3 concerning the three properties, Defendant wrote the monies owed in connection with each property, "[Address 7] is $18,303.13[.] [Address 8]-$18,669.85[.] [Address 9]- $10,018.7." Defendant wrote, "Can u pay about half on these ? And i take care of the rest[.] We can do 1 a week for the next couple weeks."

Co-conspirator #3 responded, "20%?" Thereafter, Defendant and Co-conspirator #3 continued to negotiate about what portion of the moneys owed to the City would be paid by Co-conspirator #3, the size of the bribe Co-conspirator #3 would provide to Defendant and, eventually, the timing of their meeting. For instance, Co-conspirator #2 and Defendant had the following exchange:

Co-conspirator #3: What's the lowest possible?

Defendant: 7 ?

Co-conspirator #3: I thought I was hitting u w 25%

Defendant: How much u got for it man lol

Co-conspirator #3: As much for you and as little for them as possible?

Defendant: 6k for city ? That's cool on 18 bro

Co-conspirator #3: f the city. and YES! $6k even?

Defendant: Bout 6500

. . . .

Co-conspirator #3: Cash or cashiers check?

Defendant: Cash

. . . .

Co-conspirator #3: Me and u today I'm good if your good. Inside or outside?

Defendant: Come get bill Go to mens room After paid Handshake hug done Lol[.]

Co-conspirator #3 paid Defendant a $2,500 bribe in exchange for Defendant's removal of more than $11,659.80 in funds owed to the City. Defendant noted, "2021 taxes was $12,284.86 interest was $474.08 first half of new tax $5400.86 which is total of $18,159.80 u paid $6500." Co-Conspirator #3 would go on to pay Defendant on multiple occasions thousands of dollars in cash bribes and $9,253 in bribes via Cash App and Zelle payments to Defendant in connection with the removal of various financial obligations Co-Conspirator #3 owed the City. Defendant also engaged in email correspondence with Co-conspirator #3 in connection with the bribery scheme.

In total, Defendant received more than $250,000 in connection with his bribery scheme and caused losses to Baltimore City in excess of $1,250,000.

SO STIPULATED:

Paul A. Riley
Evelyn L. Cusson
Assistant United States Attorneys

8. 28. 24
Date

Joseph A. Gillespie
Joseph Gillespie
Defendant

8. 28. 24
Date

Gerald Ruter, Esq.
Counsel to Defendant

Rev. August 2018